# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

MELISSA VIRGINIA WEIKEL,

        Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

        Defendant.

_____/

Case No. 1:16-cv-01336-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.   INTRODUCTION

On September 11, 2016, Plaintiff Melissa Virginia Weikel ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 9, 15.)

## II.     FACTUAL BACKGROUND

On July 2, 2012, Plaintiff protectively filed an application for DIB payments, alleging she became disabled on January 18, 2012, due to "[l]umbar strain, radiculopathy, and spondyloarth/osteoporosis," a "[b]ack injury," "[m]igraines," and a "[n]eck injury." (Administrative Record ("AR") 23, 26, 158–59, 167–77.) Plaintiff subsequently amended her alleged onset date to April 1, 2012. (AR 44–45.)

Plaintiff was born on May 20, 1968, and was 43 years old on the date the application was filed. (AR 27, 66, 158, 167.) She graduated from high school and completed the police academy. (AR 46–47.) From 2010 to March 2012, Plaintiff worked as a hospital cook. (AR 32–33, 60, 172, 199.) Prior to that, Plaintiff worked as a restaurant owner/manager and as a sales director/manager. (AR 32–33, 60, 172, 199.)

## A.     Relevant Medical Evidence[3]

### 1.     Olivewood Meadows Occupational Health Center

On January 18, 2012, while working as a hospital cook, Plaintiff reportedly injured her back while retrieving a case of apples from a freezer. (AR 318, 472–73.) On January 31, 2012, Plaintiff presented to Michael Robinette, M.D., and was diagnosed with lumbar strain with possible radiculopathy and lumbago. (AR 276–81.) Dr. Robinette prescribed medication and referred Plaintiff to physical therapy. (AR 276–81.) Plaintiff had an x-ray of her lumbar spine on February 2, 2012. (AR 293–94.) The x-ray showed multilevel spondyloarthropathy[4], osseous demineralization, and other chronic findings, with "[n]o acute process." (AR 293.)

An MRI of Plaintiff's lumbar spine performed on February 29, 2012, showed mild disc bulging at L4–L5 and L5–S1 with no central canal and no foraminal impingement. (AR 246–47.) At follow up appointments with Dr. Robinette in March 2012, Plaintiff reported that she had developed nausea and vomiting with medication and mild right wrist and ankle discomfort as a result of a fall due to dizziness from medication and pain patches. (AR 253–60.) In April 2012,

---

[3] As Plaintiff's assertion of error is limited to the ALJ's consideration of her alleged physical (as opposed to mental) impairments, only evidence relevant to those arguments is set forth below. The majority of the medical evidence regarding Plaintiff's physical condition was part of her workers' compensation case.

[4] Spondyloarthopathy denotes disease of the joints of the spine. *Dorland's Illustrated Medical Dictionary* at 1779 (31st ed. 2007) [hereinafter *Dorland's*].

Dr. Robinette noted that Plaintiff continued to actively splint her back, and he referred Plaintiff to a physiatrist. (AR 249–52.)

### 2. Mariposa Physical Therapy

Plaintiff attended fourteen physical therapy sessions from February 13 to April 17, 2012, having received treatment of "thermal modalities, electrical stimulation, and strengthening and flexibility exercise[s] emphasizing spinal stability." (AR 296–307.) Although Plaintiff's symptoms persisted, she reported them to a "lesser degree" and "is much more functional than she was initially." (AR 296.) As of April 17, 2012, Plaintiff's forward bending had improved from fingertips to mid-thigh to five inches above the floor. (AR 296.) Her right and left side bending and rotation were within normal limits, and her "[s]acroiliac supine to long sit tests" were negative. (AR 296.) Plaintiff's straight leg raise tests were 75 degrees and negative. (AR 296.)

### 3. Thomas Bryan, M.D.

On April 18, 2012, pain medicine and neurology specialist Dr. Bryan examined Plaintiff. (AR 318–20.) Dr. Bryan noted that Plaintiff had an "essentially a negative" MRI scan of the lumbar spine with some bulging of L4–L5 and L5–S1. (AR 318.) Dr. Bryan administered four injections in Plaintiff's buttocks, and observed Plaintiff experiencing myofascial pain in the buttocks, "especially the right buttocks that seems to be responding to the trigger point injections." (AR 319.) Dr. Bryan also found "evidence of Fibromyalgia involving [Plaintiff's] neck and trapezil and this has been causing Migraine headaches in the recent past." (AR 319.) Dr. Bryan took Plaintiff off work until May 8, 2012. (AR 319.)

On May 8, 2012, Plaintiff presented to Dr. Bryan. (AR 315–16.) She reported being in a lot of pain, particularly in her neck, and was still getting migraines, which began after her fall. (AR 315.) Dr. Bryan diagnosed Plaintiff with post-fall neck pain, low back pain, and fibromyalgia. (AR 315.) He prescribed Topamax and hydrocodone, and instructed Plaintiff to remain off work. (AR 315–16.) On June 20, 2012, Plaintiff reported doing "a lot better" on Topamax, but that she still was losing feel in her left leg and her leg "gives way." (AR 313–14.) Plaintiff also reported sleeping better. (AR 313.) Dr. Bryan's diagnosis was fibromyalgia, low back pain, chronic head pain, depression, and brachial thoracic outlet syndrome. (AR 313.) He

prescribed Sertraline, recommended stretching exercises, and instructed Plaintiff to remain off work until further notice.  (AR 313–14.)  Plaintiff declined rheumatologic testing.  (AR 313.)

### 4.  Sanjay J. Chauhan, M.D.

On August 8, 2012, Plaintiff presented to treating neurologist Dr. Chauhan.  (AR 449–62.)  Upon physical examination, Plaintiff's muscle strength of left hip flexion and knee extension was "5-/5" due to pain in the low back; her abduction and flexion was "4+/5" in her left shoulder due to pain; her reflexes and sensation were normal; her gait was "minimally slow" due to low back pain with no limp.  (AR 455.)  Plaintiff had mild tenderness and slight spasm in her cervical spine and slight to moderate spasm and tenderness in her left lumbar spine.  (AR 455–56.)  Plaintiff's straight left raising test was negative on the right side and positive on the left side at 60 degrees.  (AR 456.)

Dr. Chauhan diagnosed Plaintiff with lumbar strain, predominantly on the left side, with left lumbar radiculopathy; an iatrogenic fall around February 2012 due to pain medication and NSAID use; a fall due to her left leg giving out in June 2012, causing left shoulder strain/dislocation, right ankle strain, post traumatic headaches, and cervical strain; industrial aggravation of Plaintiff's quiescent peptic ulcer disease due to pain/anti-inflammatory medication; bilateral hand paresthesia[5] (rule out compressive neuropath/cervical radiculopathy); and secondary depression due to chronic pain.  (AR 457.)  He recommended a repeat MRI of the lumbar spine, an MRI of the cervical spine, EMG (electromyography) and NCV (nerve conduction studies) of both the upper and lower extremities, massage therapy, Vicodin for pain and Lunesta for sleep difficulty.  (AR 459–60.)  Dr. Chauhan deemed Plaintiff "temporarily totally disabled" from August 8 to September 16, 2012.  (AR 459, 464.)

Plaintiff underwent another MRI of her lumbar spine on September 1, 2012.  (AR 422–23.)  The MRI showed mild disc bulging at L4–L5 and L5–S1, with no significant neural impingement and no interval change since the previous study.  There was no finding in the MRI to explain the back pain radiating down the left leg.  (AR 422.)  On September 4, 2012, Plaintiff presented to Dr. Chauhan to "discuss other options for [her] headaches."  (AR 424.)  Her "temporary total

---

[5] Paresthesia denotes an abnormal touch sensation, such as burning or prickling.  *See Dorland's* at 1404.

disability" was continued through October 16, 2012. (AR 430, 435.) On September 6, 2012, Plaintiff had electrodiagnostic studies performed on both upper extremities, which showed no cervical radiculopathy, no carpal tunnel syndrome, no cubital tunnel syndrome, and was negative for ulnar compressive neuropathy and polyneuropathy. (AR 436.) The electrodiagnostic studies on her lower extremities, performed October 2, 2012, showed no lumbar radiculopathy and were negative for polyneuropathy. (AR 414.)

Upon examination on October 2, 2012, Dr. Chauhan recommended a trial of chiropractic treatment and a pain management consultation, noting that Plaintiff may require epidural steroid injections or facet injections. (AR 404–12.) Dr. Chauhan stated that Plaintiff was to be "managed with conservative care," as he did "not believe [Plaintiff] is a surgical candidate at this time." (AR 410.) Plaintiff's "temporary total disability" was continued through November 15, 2012. (AR 410, 419.)

At Plaintiff's follow up appointment on November 19, 2012, Dr. Chauhan found Plaintiff's gait was normal and noted a "spontaneous resolution" of Plaintiff's bilateral hand paresthesia. (AR 392–99.) He recommended additional chiropractic treatments, which she had received in September and November 2012 (AR 323, 332), observing that they have been "very helpful." (AR 397.) Dr. Chauhan also advised Plaintiff to continue taking Norco, as it seemed to "work better" than Vicodin. (AR 397.) Dr. Chauhan continued Plaintiff's "temporary total disability" for her lumbar spine through January 12, 2013. (AR 397, 401.) An MRI of Plaintiff's cervical spine performed on December 6, 2012, reportedly showed non-specific straightening of normal cervical lordosis, query strain, and 1–2 mm posterior disc bulges without evidence of canal stenosis or neural foramina narrowing from C4–C5 to C6–C7. (AR 482, 644.)

Plaintiff presented to Dr. Chauhan for a follow up appointment on January 9, 2013. (AR 379–91.) Plaintiff complained of low back pain with radiation to the left leg, neck pain, upset stomach due to medication use, and depression and frustration due to pain. (AR 380.) Dr. Chauhan observed that Plaintiff "continues to have difficulty with pain but the medication allows her to continue her activities of daily living." (AR 380.) Plaintiff's left shoulder pain, right shoulder pain, and right ankle pain were all "resolved," and her headaches were "improved" with

chiropractic/physical therapy.  (AR 380.)  Dr. Chauhan recommended that her "temporary total disability" be continued through February 28, 2013, for her lumbar spine complaints.  (AR 383, 391.)

Dr. Chauhan examined Plaintiff again on February 20, 2013, and continued her "temporary total disability" through April 5, 2013.  (AR 369–78.)  On April 2, 2013, Plaintiff reported that massage therapy was "very helpful" and kept her "functional."  (AR 359–68.)  Plaintiff's "temporary total disability" was continued through May 20, 2013, for her "lumbar spine complaints."  (AR 363, 368.)

Plaintiff was seen for a follow up appointment with Dr. Chauhan on May 21, 2013.  (AR 348–58.)  Plaintiff reported that without her opioid pain medication her pain is at "8/10" and with medication it is at "4/10."  (AR 349, 358.)  She reported the medication allowed her to perform activities of daily living, and noted occasional side effects of stomach upset, sleepiness, and itching, which she manages.  (AR 349, 358.)  Her "temporary total disability" was continued through July 1, 2013, due to her "lumbar spine complaints."  (AR 352, 357.)

On August 20, 2013, following her examination with Dr. Moses (*see* 2.A.6, *infra*), Plaintiff was seen by Dr. Chauhan.  (AR 642–50.)  Dr. Chauhan concurred with Dr. Moses that Plaintiff was at "maximum medical improvement."  (AR 643, 646.)  He adopted as "permanent work restrictions" the limitations set forth in Dr. Moses' report, *see infra*, that Plaintiff can sit for half an hour and stand for half an hour, with the ability to change positions as frequently as needed and a five-minute break for every hour of sitting, and that Plaintiff could lift and carry up to 15 pounds occasionally, and should avoid bending, stooping, and lifting from the ground.  (AR 647.)

Dr. Chauhan completed a "Residual Functional Capacity ["RFC"][6]  Questionnaire" on November 13, 2013.  (AR 495–96.)  Dr. Chauhan reported Plaintiff's diagnosis of chronic lumbar radiculopathy, secondary depression, cervical strain, and headaches.  (AR 495.)  Dr. Chauhan

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

noted Plaintiff's symptoms of pain in her low back, neck, headaches, and that Plaintiff's pain medications could cause occasional stomach upset. (AR 495.) Dr. Chauhan estimated that Plaintiff could walk one block without rest or significant pain; could sit for 30 minutes at one time and for four hours total in an 8-hour workday; and could stand and walk for 30 minutes at one time and for four hours total in an 8-hour workday. (AR 495.) Dr. Chauhan opined that Plaintiff required a job that permitted shifting positions at will from sitting, standing, or walking. (AR 495.) Plaintiff would require unscheduled breaks of 2 hours once a week. (AR 495.) Dr. Chauhan opined that Plaintiff could occasionally lift 10 pounds. (AR 496.) Plaintiff had no limitations in repetitive reaching, handling, or fingering. (AR 496.) Dr. Chauhan estimated, "based upon [his] experience with [Plaintiff], and based upon objective medical, clinical, and laboratory findings," that Plaintiff was likely to be absent from work more than four times a month as a result of her impairments. (AR 496.) Dr. Chauhan concluded by finding that Plaintiff was not physically capable of working an 8 hour day, 5 days a week, on a sustained basis. (AR 496.)

### 5. Garvey Chiropractic

Plaintiff had eight massage treatments between September and November 2012, after which Plaintiff reported she felt "relaxed" and "good." (AR 332.) In June and July 2014, Plaintiff had and additional five massage treatments. (AR 681–82.) These treatments resulted in a reduction of tension, and Plaintiff felt "relaxed" as a result. (AR 681.)

### 6. Max Moses, M.D.

On June 3, 2013, orthopedic surgeon and agreed medical evaluator Dr. Moses examined Plaintiff, reviewed her medical record, and issued an "Agreed Medical-Legal Evaluation" as part of Plaintiff's workers' compensation case.[7] (AR 471–91.) Plaintiff was described as a well-developed, well-nourished woman in no acute distress who walks with a "normal plantigrade gait with a slight list to the left." (AR 479.) Dr. Moses noted that examination of the cervical spine showed mild muscle guarding, mainly in the right paracervical region, while the lumbar spine showed pain and muscle guarding in the left paralumbar region with radiation down the left

---

[7] Dr. Moses was apparently selected by agreement of both parties to examine Plaintiff and render an opinion as to her impairments and limitations. *See* Cal. Labor Code § 4062.2 (procedure for parties in workers' compensation case to together select "agreed medical evaluator").

gluteal region to the posterior aspect of the thigh.  (AR 481.)  Plaintiff's straight leg raising test results was to about 80 degrees on the right and to 60 degrees on the left.  (AR 481.)

Dr. Moses diagnosed Plaintiff with (1) lumbar sprain/strain with muscle guarding and nonverifiable radiculopathy, and (2) cervical sprain/strain with muscle guarding.  (AR 481.)  With respect to Plaintiff's lumbar spine, Dr. Moses based his diagnosis on findings that she walks with a slight list to the left, has muscle guarding in the left paralumbar region, has limitations in range of motion, her straight leg raising test to 80 degrees on the right and 60 degrees on the left, and the September 1, 2012, MRI results.  (AR 482.)  Regarding Plaintiff's cervical spine, Dr. Moses' diagnosis was based on findings of mild muscle guarding in the right paracervical region, limitations in range of motion, and the December 6, 2012, MRI results.  (AR 482.)

Dr. Moses concluded that Plaintiff was at "maximum medical improvement" and opined Plaintiff could perform modified work.  (AR 482.)  He opined that she can sit for a half hour and stand for a half hour, with the ability to change positions as frequently as needed and a five-minute break for every hour of sitting.  (AR 482.)  Dr. Moses found that Plaintiff could lift and carry up to 15 pounds occasionally, and should avoid bending, stooping, and lifting from the ground.  (AR 482.)  Dr. Moses advised that Plaintiff "should have a refresher course of physical therapy" with instruction in what exercises to do at home for her low back and cervical spine and should continue with yoga and therapy.  (AR 483, 485.)  Dr. Moses noted that Plaintiff would benefit from a gym membership to do exercises on a regular basis.  (AR 483, 485.)

### 7.    State Agency Physicians

On November 1, 2012, G. Bugg, M.D., a Disability Determinations Service medical consultant, assessed Plaintiff's RFC and found that, taking into account her back pain, mild lumbar spondylosis, and myofascial pain, Plaintiff could (1) occasionally lift and/or carry 20 pounds and frequently 10 pounds; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions.  (AR 71, 73.)  Plaintiff could occasionally climb, balance, kneel, crouch, and crawl, and had no manipulative, visual, communicative, or environmental limitations.  (AR 74.)

Upon reconsideration on September 9, 2013, another Disability Determinations Service medical consultant, A. Lizarraras, M.D., affirmed Dr. Bugg's RFC findings. (AR 85–86.) Dr. Lizarraras discounted Dr. Moses' opinion, finding that it relied heavily on Plaintiff's subjective reporting of symptoms and limitations and that the "totality of the evidence does not support the opinion"; and that the opinion contained "inconsistencies, rendering it less persuasive." (AR 87.) Dr. Lizarraras also found that Dr. Moses' opinion was "without substantial support from other evidence of record." (AR 87.)

### 8. John C. Fremont Healthcare District

Plaintiff underwent x-rays of her cervical spine and left shoulder on March 13, 2014. (AR 563–64.) The x-ray of Plaintiff's cervical spine showed straightening that may be indicative of muscle spasm, mild narrowing of the C5–C6 intervertebral disc space, with no fractures or subluxations and intact odontoid and posterior elements. (AR 563.) Plaintiff's left shoulder x-ray was normal, with no fractures, dislocations, arthritic, or degenerative changes. (AR 564.)

On May 27, 2014, Plaintiff presented to neurologist Diana J. Hylton, M.D., complaining of pain and numbness in her left arm that "comes and goes." (AR 548.) According to Plaintiff, her pain radiated down to the ulnar distribution of her fingers. (AR 548.) On examination, Dr. Hylton noted stiffness in range of motion of the cervical spine to the left, focal tenderness in the left biceps and pectoralis major tendon causing a referred sensation of numbness to her arm, and pain with range of motion of the left shoulder. (AR 548.) Plaintiff had normal strength, with reflexes of "2+" symmetric, and intact sensory exam. (AR 548.) Dr. Hylton diagnosed Plaintiff with either biceps of pectoralis major tendinopathy on the left causing referred sensation of pain into the left arm. (AR 548.) She noted having reviewed Plaintiff's March 13, 2014, cervical spine x-ray, which "suggested narrowing of the C5-6 disc," but further observed that Plaintiff "does not have any radicular findings." (AR 548.)

### B. Plaintiff's Statement

On October 14, 2012, Plaintiff completed an adult function report. (AR 188–96.) Plaintiff stated that she has chronic pain in her back that also goes down her leg, which has caused her leg to go numb "several times" and to fall. (AR 188.) Plaintiff stated that she also has migraines,

"sometimes lasting up to 8 days where [she] cannot get out of bed," and she experiences nausea and vomiting. (AR 188.) When asked to describe what she does from the time she wakes up to the time she goes to bed, Plaintiff reported that she usually watches television, plays on her computer, and goes for walks. (AR 189.) She also drives to go see her grandchildren. (AR 189.) She has a Chihuahua that she feeds and lets outside. (AR 189.)

Plaintiff reported that her conditions do not affect her personal care, except that she does not cook as much. (AR 189.) Plaintiff prepares her own meals of Lean Cuisines and sandwiches weekly, but does not cook as often because "it hurts to stand for long periods of time." (AR 190.) Plaintiff "wipes down counters, etc." and dusts, and has a housekeeper to clean her bathroom and for "deep cleaning." (AR 190.) She does not perform other house or yard work because "it just hurts to [sic] much." (AR 191.) Plaintiff reported that she goes outside, drives and rides in a car, and goes grocery shopping once a week for about 30 minutes. (AR 191.) Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook. (AR 191.) Plaintiff's interests and hobbies are watching television, church reading, and playing on her computer. (AR 192.) Plaintiff reported visiting her mother, kids, and grandkids, as well as attending church and baseball games, on a weekly basis. (AR 192.) She can walk "a couple of blocks" and can resume walking after 5 minutes. (AR 193.) Plaintiff has a cane that she uses "as needed" when her left leg goes numb. (AR 194.) Plaintiff takes Vicodin, Norco, topinmate, and zolpidem tartrate, experiences nausea, vomiting, blurred vision, and tiredness as a result. (AR 195.)

**C.  Plaintiff's Mother's Statement**

On October 14, 2012, Plaintiff's mother Nancy Coberley completed a third party adult function report. (AR 178–86.) Ms. Coberley reports that Plaintiff is not able to lift anything or bend over, cannot sit for very long, has migraine headaches, and is often sick to her stomach "due to the pain in her back." (AR 178.) During a typical day, Plaintiff stays in bed, takes hot baths, watches television, and is on her computer. (AR 179.) Plaintiff feeds her pets, and Ms. Coberley bathes and grooms them and gives them medicine. (AR 179.) Ms. Coberley reported that Plaintiff's condition does not affect her personal care, except that she cannot vacuum or clean her shower or toilet. (AR 179.) According to Ms. Coberley, Plaintiff sometimes makes frozen

dinners for meals, but cannot sit or stand for very long.  (AR 180.)  Mr. Coberley reported that Plaintiff needed help cleaning her house and bathroom and doing yard work.  (AR 180.)

Plaintiff's hobbies and interests include watching television and playing games on her laptop.  (AR 182.)  Ms. Coberley reported that Plaintiff goes to see her children and grandchildren once a week or every two weeks.  (AR 182.)  According to Ms. Coberley, Plaintiff attends church for 1 hour on Sundays, and "sometimes is not able to go anywhere for several weeks."  (AR 182.) Ms. Coberley stated that Plaintiff could lift "maybe 5 lbs.," walk "not more than a block or so," and can only shop for about a half hour.  (AR 183.)  Plaintiff uses a cane and a walker and "tends to fall because her leg gives out."  (AR 184.)

**D.  Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on November 14, 2012, and again on reconsideration on September 10, 2013.   (AR 91–94, 100–103.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 105–110.)  At the hearing on February 10, 2015, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions.  (AR 45–60.)

**1.  Plaintiff's Testimony**

Plaintiff testified that she has "constant" pain in her left lower back that gets worse when she is sitting and standing for longer periods of time.  (AR 52.)  When she is in pain, she "massage[s] it a lot," changes positions between sitting and standing, moves around, and "shuffle[s]."  (AR 52.)  Plaintiff gets massages on a regular basis.  (AR 52.)  Plaintiff testified she also has "constant" neck pain, which increases when she "starts turning a lot or moving with it." (AR 53.)  Plaintiff uses creams, prescription and non-prescription pain patches, and a TENS unit to address her pain.  (AR 56.)  She also uses pain medication, which she tries to avoid unless her pain is "severe," as it makes her sick.  (AR 56.)

Plaintiff also described tingling and numbness in her left arm, causing her left hand to get "real, real, cold," and numbness in her left leg that comes and goes, causing her to fall occasionally.  (AR 54.)  Plaintiff testified she is on medication (Topamax) that helps the frequency and severity of her migraines, which she gets once to twice a week and that last hours or

sometimes the whole day.  (AR 54–55.)  According to Plaintiff, she can no longer afford physical therapy, injections, and chiropractic sessions, but she found them helpful, particularly the chiropractic sessions.  (AR 59.)

Plaintiff testified that she can lift and carry about 5 to 10 pounds.  (AR 56.)  Plaintiff can sit about 15 to 20 minutes before needing to stand up, and can stand 10 to 15 minutes before needing to sit down and rest.  (AR 49, 56.)  Plaintiff testified that she can walk a couple of blocks, and goes for "little walks" near her home in the mountains.  (AR 57.)  Plaintiff has difficulty bending over and putting on her shoes and socks, and would need to "bend slowly" to retrieve something from the floor.  (AR 57.)  She avoids stairs unless it is an emergency.  (AR 57.)  Plaintiff testified she can type on a keyboard for about 10 to 15 minutes before taking a break.  (AR 58.)

Plaintiff lives alone.  (AR 46, 47.)  She testified that she needs no help showering or dressing, and she cooks and shops.  (AR 47.)  Plaintiff performs no yard work.  (AR 47.)  Plaintiff testified that she drives and attends church every Wednesday and Sunday, visits her children and grandchildren, and likes to cook.  (AR 47–48.)  When asked what she does in a typical day, she testified she runs a page on the Internet titled "Amazing Love for Jesus" and does "encouragement daily."  (AR 48.)  Plaintiff testified she is an ordained minister and in that capacity does counseling with couples.  (AR 48.)  Plaintiff does "light housework" and has a friend help vacuum and mop.  (AR 49.)

### 2.  Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a hospital cook, Dictionary of Operational Titles (DOT) code 315.361-010, which was medium exertional work, with a specific vocational preparation (SVP)[8] of 6, performed at medium; as a sales director, DOT code 163.167-018, sedentary and SVP of 8, performed at medium; and as an owner/operator/manager of a restaurant, DOT code 187.167-106, light, SVP of 7, performed at

---

[8] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation).  *Id.*

very heavy. (AR 60–61.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with her work background. (AR 61.) The VE was also to assume this person is limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing and/or walking for six to eight hours in an eight-hour workday; and limited to stooping, crouching, crawling, climbing, kneeling, and balancing occasionally. (AR 61.) The VE testified that such a person could not perform Plaintiff's past relevant work as performed, but would be able to perform such past work per the DOT. (AR 61.) The ALJ asked a follow up question regarding a second hypothetical worker who was limited to lifting and carrying 15 pounds occasionally and 10 pounds frequently; sitting, standing and/or walking for six to eight hours out of an eight-hour workday, with a change of positions every 30 minutes and a five-minute break for every hour of sitting; and limited to bending, stooping and/or lifting from the ground occasionally. (AR 61–62.) The VE testified that there would be no work that such individual could perform. (AR 62.)

Finally, Plaintiff's attorney inquired of the VE whether an individual who would be expected to be absent from work four or more times in a month period on average could perform Plaintiff's past work or any work in the national economy. (AR 63.) The VE testified that that there would be no work that such individual could perform. (AR 63.)

**E. The ALJ's Decision**

In a decision dated March 27, 2015, the ALJ found that Plaintiff was not disabled. (AR 23–34.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 24–33.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since January 18, 2012. (AR 25.) The ALJ found that Plaintiff had the severe impairments of lumbar degenerative disc disease and cervical degenerative disc disease. (AR 25.) However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (AR 11, 13–18.) The ALJ determined that Plaintiff had the RFC

> to lift and/or carry 20 pounds occasionally and 10 pounds frequently. She could sit 6 to 8 hours, stand and/or walk 6 to 8 hours in an 8-hour workday. This capacity most closely approximates light work as defined in 20 CFR [§] 404.1567(b) except she could occasionally stoop, crouch, crawl, climb, balance or kneel.

(AR 26.)

The ALJ determined that, given her RFC, Plaintiff was able to perform her past relevant work as a sales director and restaurant manager "as generally performed." (AR 33.) In reaching her conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 27, 32.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on July 8, 2016. (AR 1–4.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.981.

### III.    SCOPE OF REVIEW

The Court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), quoting *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

### IV.    APPLICABLE LAW

Social security claimants have the initial burden of proving disability. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5. An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are

demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)–(3).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. § 404.1520(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. § 404.1520(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity (RFC) despite the impairment or various limitations to perform his past work. *Id*. § 404.1520(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. § 404.1520(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett*, 180 F.3d at 1098–99; 20 C.F.R. § 404.1520.

The RFC is the "maximum degree to which [a plaintiff] retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. 404, Subpt. P, App. 2 § 200(c). It is an administrative decision as to the most a plaintiff can do, despite his limitations. Social Security Ruling ("SSR") 96–8p. The ALJ must assess all of the relevant evidence, including evidence regarding symptoms that are not severe, to determine if the claimant retains the ability to work on a "regular and continuing basis," *e.g.*, eight hours a day, five days a week. *Reddick v. Chater*, 157 F.3d 715, 724 (9th Cir. 1998); *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995); SSR 96–8p. The RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history; the effects of treatment, including limitations or restrictions

imposed by the mechanics of treatment (*e.g.*, side effects of medication); reports of daily activities; lay activities; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from work attempts; need for structured living environment; and work evaluations.  SSR 96–8p.

In making an RFC determination, the ALJ shall set out a detailed and thorough summary of the facts and conflicting clinical evidence, state any interpretations, and make findings. *Morgan v. Comm'r of Social Sec. Admin.,* 169 F.3d 595, 600–01 (9th Cir. 1999) (citation omitted).  An ALJ is not required to discuss all the evidence presented, but must explain the rejection of uncontroverted medical evidence, as well as significant probative evidence.  *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted).  Moreover, an ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the records that bolster his findings.  *See, e.g., Holohan v. Massanari,* 246 F.3d 1195, 1207 (9th Cir. 2001) (holding that an ALJ cannot selectively rely on some entries in the plaintiff's records while ignoring others); *Aukland v. Massanari,* 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'") (citing *Sousa v. Callahan,* 143 F.3d 1240, 1243 (9th Cir. 1998)); *see also Reddick,* 157 F.3d at 722–23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports").  In addition, "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that . . . [the][C]ourt can determine whether the reasons for rejection were improper."  *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (internal citation omitted).  *See also Flores v. Shalala,* 49 F.3d 562, 571 (9th Cir. 1995) (The "ALJ's written decision must state reasons for disregarding [such] evidence.")

## IV.    DISCUSSION

Plaintiff contends that the ALJ erred in three ways.  First, Plaintiff claims the ALJ erred in her treatment of the medical opinions of Drs. Moses, Chauhan, and Bryan, leading to a failure to properly assess Plaintiff's RFC.  (*See* Doc. 21 at 13–22; Doc. 25 at 1–4.)  Second, Plaintiff asserts that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's testimony

regarding her subjective complaints. (*See* Doc. 21 at 22–24; Doc. 25 at 4–5.) Finally, Plaintiff contends that the ALJ erred in improperly disregarding Plaintiff's mother's testimony. (*See id.*)

Defendant counters that that the ALJ properly rejected Dr. Moses' and Dr. Chauhan's opinions as unsupported by the objective medical evidence in the record, that Dr. Bryan's statements were on matters reserved to the Commissioner and therefore properly discounted, and that the ALJ properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and limitations and her mother's similar testimony. (*See* Doc. 24 at 8–21.)

## A. The ALJ Did Not Err in Formulating Plaintiff's RFC.

### 1. Medical Opinions

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. *Holohan*, 246 F.3d at 1201–02; *Lester*, 81 F.3d at 830. Generally speaking, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than a non-examining physician's opinion. *Holohan*, 246 F.3d at 1202.

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830-31. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund*, 253 F.3d at 1157,[9] except that the ALJ in any event need not give it any weight if

---

[9] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallane*s, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

**2. The ALJ Appropriately Assessed the Opinions of Drs. Moses and Chauhan, and Any Failure to Assess Dr. Bryan's Opinion Was Harmless Error.**

**a. Dr. Moses**

Plaintiff was evaluated by orthopedic surgeon and agreed medical evaluator Dr. Moses on June 3, 2013. (AR 471–91.) His clinical findings included that Plaintiff showed mild muscle guarding in her cervical spine, mainly in the right paracervical region, while the lumbar spine showed pain and muscle guarding in the left paralumbar region with radiation down the left gluteal region to the posterior aspect of the thigh. (AR 481.) Plaintiff's straight leg raising was to about 80 degrees on the right and to 60 degrees on the left. (AR 481.)

Dr. Moses diagnosed Plaintiff with (1) lumbar sprain/strain with muscle guarding and nonverifiable radiculopathy, and (2) cervical sprain/strain with muscle guarding. (AR 481.) From this, Dr. Moses concluded that Plaintiff was at "maximum medical improvement" and could perform modified work. (AR 482.) He opined that she can sit and/or stand for a half hour, with the ability to change positions as frequently as needed and a five-minute break for every hour of sitting. (AR 482.) Dr. Moses found that Plaintiff could lift and carry up to 15 pounds occasionally, and should avoid bending, stooping, and lifting from the ground. (AR 482.)

Although not specifically identified by the ALJ as a basis for its rejection, Dr. Moses' opinion is contradicted by the medical opinion evidence of Disability Determinations Service medical consultants Drs. Bugg and Lizarraras.[10] Drs. Bugg and Lizarraras both opined that Plaintiff could stand, walk, and sit up to six hours in an eight-hour workday and could lift and carry 10 pounds frequently and 20 pounds occasionally. (AR 71, 73, 85–86.) Thus, the ALJ was required to state "specific and legitimate reasons," supported by substantial evidence, for rejecting

---

[10] The ALJ accorded the opinion of Dr. Lizarraras "greatest weight," in view of him having had "the opportunity to consider the entire treatment history as summarized by Dr. Moses," and having had "the benefit of reviewing the more recent treatment records and [having] compared all of the objective findings to the medical source statements of record." (AR 32.)

Dr. Moses' opinion.[11]

In reviewing the medical evidence and giving only "some weight" to Dr. Moses' opinion, the ALJ stated that "[t]he more recent medical evidence shows greater improvement than assessed by Dr. Moses" and "[t]he medical record contains very little objective evidence, which does not support the limitations given by [Dr. Moses]." (AR 31.) An ALJ may properly discount an examining physician's opinion that is not supported by the medical record. *Batson v. Comm'r of Social Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (citing *Matney on Behalf of Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Here, the ALJ properly rejected Dr. Moses' assessment of Plaintiff because it was not supported by the objective medical evidence, particularly objective medical testing both before and after Dr. Moses' assessment.

The ALJ noted that the February 29, 2012, MRI of Plaintiff's lumbar spine was interpreted as "essentially normal." (AR 27, 246–47, 318 (observing that Plaintiff had an "essentially a negative" MRI scan of the lumbar spine, showing mild disc bulging of L4–L5 and L5–S1).) A subsequent MRI of Plaintiff's lumbar spine showed no changes from the previous study, with no significant neural impingement and no finding to explain Plaintiff's complaints of back pain radiating down the left leg. (AR 29, 422–23.) A December 6, 2012, MRI of Plaintiff's cervical spine reportedly showed 1–2 mm posterior disc bulges, but no evidence of canal stenosis or neural foramina narrowing from C4–C5 to C6–C7. (AR 31, 482, 644.) The ALJ observed that Plaintiff completed fourteen physical therapy visits in April 2012, after which she experienced significant symptom reduction and increased function. (AR 31, 296–307.)

The medical evidence from the time period after Dr. Moses's assessment also fails to support Dr. Moses' opined limitations. As the ALJ noted, a March 13, 2014, x-ray of Plaintiff's cervical spine showed only mild narrowing of the C5–C6 intervertebral disc space, intact odontoid

---

[11] While the Commissioner is correct that Dr. Moses is not a "consultative examiner" retained by Disability Determinations Service, the Court nevertheless analyzes the ALJ's treatment of Dr. Moses' opinion under the Ninth Circuit's "specific and legitimate reasons" standard of review. *See, e.g., Smith v. Comm'r of Social Sec.*, No. 2:16–cv–1561–KJN, 2017 WL 5972737, at *4–5 (E.D. Cal. Dec. 1, 2017).

and posterior elements, and no fractures or subluxations and intact odontoid and posterior elements. (31, 563–64.) An x-ray of Plaintiff's left shoulder performed that same day was normal. (AR 564.) On May 27, 2014, Plaintiff presented to neurologist Diana J. Hylton, M.D., complaining of pain and numbness in her left arm that "comes and goes." The ALJ pointed out that Dr. Hylton diagnosed Plaintiff with either biceps of pectoralis major tendinopathy on the left causing referred sensation of pain into the left arm. (AR 31–32, 548.) The ALJ noted that Dr. Hylton reviewed Plaintiff's March 13, 2014, cervical spine x-ray, which "suggested narrowing of the C5-6 disc," but observed that Plaintiff "does not have any radicular findings." (AR 31–32, 548.)

In sum, the objective medical evidence does not support Dr. Moses' opinion that Plaintiff is limited to sitting and/or standing for 30 minutes at a time and lifting and carrying up to 15 pounds occasionally, needs to change positions as frequently as needed, requires a five-minute break for every hour of sitting, and must avoid bending, stooping, and lifting from the ground. (AR 246–47, 296–307, 318, 422–23, 482, 548, 563–64, 644.) The ALJ therefore provided specific, legitimate reasons supported by substantial evidence for discounting the opinion of Dr. Moses. *See Magallanes*, 881 F.2d at 751; *see also Bayliss v. Barhart,* 427 F.3d 1211, 1216 (9th Cir. 2005); *Batson*, 359 F.3d at 1195.

### b. Dr. Chauhan

Treating neurologist Dr. Chauhan adopted as "permanent work restrictions" the limitations opined by Dr. Moses, *see supra*. (AR 31, 647.) In November 2013, Dr. Chauhan opined to additional limitations in his "Residual Functional Capacity Questionnaire," namely that Plaintiff could sit, stand and/or walk for four hours total in an 8-hour workday, that she required unscheduled breaks of two hours once a week, that she could occasionally lift 10 pounds, and that she was likely to be absent from work more than four times a month as a result of her impairments. (AR 31, 496.) Dr. Chauhan concluded by finding that Plaintiff was not physically capable of working an 8 hour day, 5 days a week, on a sustained basis. (AR 31, 496.)

Like Dr. Moses' opinion, Dr. Chauhan's opinions are contradicted by the medical opinion evidence of Disability Determinations Service medical consultants Drs. Bugg and

Lizarraras. (AR 71, 73, 85–86.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Chauhan's opinions. In reviewing the medical evidence and rejecting Dr. Chauhan's opinions, the ALJ stated that "[t]he medical record contains very little objective evidence, which does not support the limitations . . . adopted by Dr. Chauhan" and "the more recent studies show no worsening of her condition and support finding a greater functional capacity since the time of these assessments. (AR 31.) The ALJ's reasons for rejecting Dr. Chauhan's opinions are therefore substantially similar to her reasons for rejecting Dr. Moses' opinion.[12] As with Dr. Moses, that Dr. Chauhan's opinions lack supporting clinical findings constitutes a specific and legitimate reason for affording his opinion no weight. Moreover, as the ALJ points out, the objective medical evidence from the time period from the time period after Dr. Chauhan's RFC assessment in November 2013 support finding that Plaintiff had a greater functional capacity than Dr. Chauhan opined. (*See, e.g.*, AR 31–32, 548, 563–64.) Thus, substantial evidence supports the ALJ's finding that the objective medical evidence and the subsequent testing results did not support the severe limitations Dr. Chauhan assessed. To the extent that Plaintiff suggests Dr. Chauhan's treatment records are consistent with the limitations he opined (*see* Doc. 21 at 19–20), this Court will not second guess the ALJ's reasonable determination to the contrary, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Robbins*, 466 F.3d at 882.[13]

///

---

[12] This is hardly surprising, considering Dr. Chauhan *adopted* Dr. Moses' limitations. (AR 647.) Because the Court finds that the ALJ properly assessed and discounted Dr. Moses' opinion, *see supra*, it similarly finds that the ALJ properly assessed and discounted Dr. Chauhan's opinion adopting that of Dr. Moses.

[13] In her opening brief, Plaintiff further asserts that the ALJ's decision "fails to recognizes [sic] that Dr. Chauhan opined, from August 2012 through July 2013, that Plaintiff remained under 'temporary total disability,'" which Plaintiff suggests "alone could have resulted in a closed period of benefits." (Doc. 25 at 21; *see also id.* at 23 n.3 (claiming Dr. Moses' opinion "could have entitled Plaintiff to a close [sic] period of benefits") Other than this naked assertion, however, Plaintiff offers no argument to support her contention, and the Court declines to formulate one. *See, e.g., Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading [the plaintiff's] brief, one wonders if [the plaintiff], in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort through the noodles in search of [plaintiff's] claim") (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim . . . [j]udges are not like pigs, hunting for truffles buried in briefs.")). *See also Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim . . . ."); *Hibbs v. Dept. of Hum. Resources*, 273 F.3d 844, 873 n.34 (deeming a one-sentence argument "too undeveloped to be capable of assessment.")

### c. Dr. Bryan

Finally, Plaintiff contends that the ALJ's RFC formulation is erroneous because she improperly ignored Dr. Bryan's opinion that Plaintiff "was to remain off work indefinitely and that he provided her with palliative injections for pain." (Doc. 21 at 24.) While it is true that the ALJ erred in failing to offer specific reasons to reject Dr. Bryan's opinion, that, as of July 2012, Plaintiff was to "remain off work until further notice"[14], such error is harmless because the opinion is essentially identical to Dr. Chauhan's opinion that Plaintiff was not physically capable of performing full-time work on a sustained basis, which the ALJ properly discredited as unsupported by the objective medical evidence, *see supra*. Therefore, it was inconsequential to the formulation of Plaintiff's RFC assessment. *See Carmickle v. Comm'r, Social Sec. Admin.,* 533 F.3d 1155, 1162 (9th Cir. 2008); *Stout v. Comm'r, Social Sec. Admin,* 454 F.3d 1050, 1055 (9th Cir. 2006).

In sum, the Court concludes that the ALJ cited specific and legitimate reasons, supported by substantial evidence, to reject Drs. Moses' and Chauhan's opinions, and that the ALJ's failure to proffer reasons for her rejection of Dr. Bryan's opinion was harmless error.

### B. The ALJ Properly Found Plaintiff Less Than Fully Credible.

#### 1. Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the

---

[14] To the extent Plaintiff suggests that Dr. Bryan's administration of pain injections is an "opinion" that the ALJ impermissibly rejected, Plaintiff does not articulate what functional limitation on her ability to work on a sustained basis this "opinion" endorses.

symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.* As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti,* 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray,* 554 F.3d at 1226–27; 20 C.F.R. § 404.1529. Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester*, 81 F.3d at 834).

### 2. Analysis

Here, the ALJ found Plaintiff's credibility was undermined by several factors:

> I found [Plaintiff's] testimony was somewhat credible, but did not support her allegations of debilitating pain and limitation. Indeed, her daily activities are much more extensive than would be expected if her impairments, in fact, caused the limitations alleged. Moreover, [Plaintiff] seemed to obtain good benefit from conservative modalities such as physical therapy, pain patches, massage, and chiropractic manipulation. No physician has recommended her for back or neck surgery and [Plaintiff] is able to live independently, socialize, and get around without assistance. As noted, she shops, drives, does household chores, cooks, manages her finances, and lives alone.

(AR 32.) In sum, in assessing Plaintiff's credibility, the ALJ relied on evidence of inconsistencies between Plaintiff's symptoms and her reports of activities of daily living and the lessening of

Plaintiff's symptoms with conservative treatment.

### a. Activities of Daily Living

The ALJ appropriately considered Plaintiff's activities of daily living in determining that she was not entirely credible. When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferrable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan*, 169 F.3d at 600 (quoting *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989)); *see also Molina v. Astrue,* 674 F.3d 1104, 1112 (9th Cir. 2012) ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.") (internal quotation and citations omitted). "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Id.* (citations omitted).

Plaintiff alleges that she has "constant" pain in her left lower back that gets worse when she is sitting and standing for longer periods of time, and described tingling and numbness in her left arm and leg. (AR 52, 54, 188.) She asserts that she can lift and carry about 5 to 10 pounds, can sit about 15 to 20 minutes before needing to stand up, can stand 10 to 15 minutes before needing to sit down and rest, and can walk only a "couple of blocks." (AR 49, 56, 57, 193.) The ALJ found, however, that Plaintiff's daily activities are "much more extensive that would be expected if her impairments, in fact, caused the limitations alleged." (AR 32.) In particular, the ALJ found that Plaintiff, based on her own testimony, was able to shop, drive, do household chores, cook, manage her finances, live independently, socialize, and "get around without assistance." (AR 26, 30, 32.) Plaintiff also reported that she goes for walks, dusts, feeds her dog, goes to church twice per week, visits family and attends baseball games weekly, volunteers as an ordained minister, runs an Internet website, and performs online couples counseling. (AR 26, 30, 32, 47–48, 57, 189, 190, 192.)

This Court's recent order in *Martin v. Colvin*, 2017 WL 615196, at *11 (E.D. Cal. Feb. 14, 2017) is instructive. In that case, the claimant was able to run errands using public transportation,

read, crochet, watch television, and perform such household chores as cooking, laundry, vacuuming, cleaning the bathtub and shower bench. *Id*. The Court found that such "activities tended to suggest that the claimant may have still been capable of performing the basic demands of unskilled work on a sustained basis." *Id*. Here, Plaintiff engaged in largely the same types of daily activities, in fact to a greater extent, as the claimant in *Martin*. As such, the Court similarly finds that such activities tend to suggest that Plaintiff may still be able to perform, on a sustained basis, the basic demands of her past work of sales director (manager) and restaurant manager as generally performed. *See Fair,* 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also*, e.g., *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Morgan*, 169 F.3d at 600 (ALJ's determination regarding claimant's ability to "fix meals, do laundry, work in the yard, and occasionally care for his friend's child" was a specific finding sufficient to discredit the claimant's credibility); *Kelly v. Astrue*, 471 F. App'x 674, 677 (9th Cir. 2012) (holding that ALJ properly made an adverse credibility finding because, in part, claimant's daily activities included driving, washing the dishes, shopping, and caring for her two children); *Nelson v. Colvin*, No. 1:15-cv-00696-SKO, 2016 WL 3407627, at *20 (E.D. Cal. June 20, 2016) (ALJ properly discredited subjective complaints of claimant who suffered from chronic back problems where claimant engaged in activities such as preparing simple meals, washing dishes, driving a car, shopping for groceries and household supplies 2–3 times a week, walking up to a mile, using a computer for about half an hour at a time, visiting with family, mopping and vacuuming, independently handling her own finances, and doing yoga tapes at home.).

To be sure, the record also contains some contrary evidence, such as Plaintiff's statements regarding chronic pain in her back and her inability to sit and stand comfortably for more than 20 minutes. (AR 30, 49, 56, 188, 477.) However, it is the function of the ALJ to resolve any

ambiguities, and the Court finds the ALJ's assessment of Plaintiff's daily activities to be reasonable and supported by substantial evidence. *See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### b. Conservative Treatment

The ALJ's credibility assessment also properly relied on evidence that Plaintiff "seemed to obtain good benefit from conservative modalities" and "[n]o physician recommended her for back or neck surgery."[15]  (AR 32.)  The ALJ observed that Plaintiff had used a splint for her back, a TENS unit, pain patches, and creams to address her pain.  (AR 56.)  .  (AR 26, 27, 32, 56, 254.)  In January 2012, Dr. Robinette recommended physical therapy, and Plaintiff attended fourteen physical therapy sessions between February and April 2012.  (AR 276–81, 296–307.)  Plaintiff's therapy included "thermal modalities, electrical stimulation, and strengthening and flexibility exercise[s] emphasizing spinal stability," and, as the ALJ noted, Plaintiff's symptoms significantly improved and her function increased as a result.  (AR 27, 31, 296, 380.)

In August 2012, Plaintiff presented to treating neurologist Dr. Chauhan, who, despite observing a "mild tenderness and slight spasm in her cervical spine and slight to moderate spasm and tenderness in her left lumbar spine, recommended only massage therapy and Vicodin for pain.  (AR 29, 459–60)  Plaintiff had eight massage treatments between September and November 2012.  (AR 323, 332.)  In October 2012, Dr. Chauhan recommended a trial of chiropractic treatment and a pain management consultation, noting that Plaintiff may require epidural steroid injections or facet injections.  (AR 404–12.)  Dr. Chauhan recommended additional chiropractic treatments in November 2012, which he observed had been "very helpful" in addressing her low back pain.  (AR 29, 397.)  Plaintiff herself reported to Dr. Chauhan in April 2013 that massage therapy was "very helpful" and kept her "functional."  (AR 29, 360.)

In June 2013, evaluating orthopedic surgeon Dr. Moses advised that Plaintiff "should have

---

[15] Other than noting that the ALJ's observation that Plaintiff "has not undergone surgery for her spine impairments" (Doc. 21 at 26), Plaintiff's briefing does not address the ALJ's reliance on Plaintiff's receipt of only conservative treatment as a reason to discredit her subjective complaints of pain.  (*See id.* at 26–27; Doc. 25 at 6.)

a refresher course of physical therapy" with instruction in what exercises to do at home for her low back and cervical spine and should continue with yoga and therapy. (AR 483, 485.) Dr. Moses noted that Plaintiff would benefit from a gym membership to do exercises on a regular basis. (AR 483, 485.) At the hearing, Plaintiff testified that she gets massages on a regular basis and that, although she can no longer afford physical therapy, injections, and chiropractic sessions, she found them helpful, particularly the chiropractic sessions. (AR 52, 59.)

As the ALJ observed, Dr. Chauhan expressly stated that Plaintiff was to be "managed with conservative care," as he did "not believe [Plaintiff] is a surgical candidate at this time," and there is no indication in the record that any other physician recommended that Plaintiff have surgery. (AR 32, 410.) Based on the above conservative treatment, which the record shows resulted in a lessening of her symptoms, the ALJ was entitled to discount Plaintiff's credibility. *See Tommasetti,* 533 F.3d at 1040 (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset"); *Parra v. Astrue*, 481 F.3d 742, 750–51 (9th Cir. 2007) (evidence of conservative treatment is sufficient to discount a claimant's testimony regarding severity of an impairment); *Morgan*, 169 F.3d at 599 (ALJ's adverse credibility determination properly accounted for physician's report of improvement with use of medication); *Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ may properly rely on the fact that only conservative treatment has been prescribed); *Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (ALJ may consider whether treatment produced fair response or control of pain that was satisfactory).

The record also shows that Plaintiff was prescribed Norco and Vicodin, which relieved the pain[16] (despite causing nausea and vomiting), and received four injections of Kenalog and Marcaine by Dr. Bryan in her buttocks to treat inflammation and pain. (AR 27, 29, 195, 315–16, 319, 349, 358, 397, 459–60.) While injections, by themselves, have been found not to constitute conservative treatment, *see Yang v. Colvin*, No. CV 14–2138–PLA, 2015 WL 248056, at *6 (C.D.

---

[16] Impairments that can be controlled effectively with medication are not considered disabling. *Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Cal. Jan. 20, 2015), courts have frequently found that the fact that Plaintiff has been prescribed narcotic medication or received injections does not negate the reasonableness of the ALJ's finding that Plaintiff's treatment *as a whole* was conservative, particularly when undertaken in addition to other, less invasive treatment methods. *See Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment.); *Morris v. Colvin,* No. 13–6236, 2014 WL 2547599, at *4 (C.D. Cal. June 3, 2014) (ALJ properly discounted credibility when plaintiff received conservative treatment consisting of physical therapy, use of TENS unit, chiropractic treatment, Vicodin, and Tylenol with Vicodin); *Jones v. Comm'r of Social Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility); *Higinio v. Colvin*, No. EDCV 12–1820 AJW, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014) (holding that despite the fact that the claimant had been prescribed narcotic pain medication at various times, the claimant's overall treatment—which also included use of a back brace and a heating pad—was conservative); *Walter v. Astrue*, No. EDCV 09–1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discredited claimant's allegations based on conservative treatment consisting of Vicodin, physical therapy, and an injection). Accordingly, the ALJ's adverse credibility determination based on Plaintiff's conservative treatment and benefit therefrom will not be disturbed.

### C. The ALJ's Rejection of Plaintiff's Mother's Lay Testimony is Harmless Error.

#### 1. Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis*, 236 F.3d at 511; *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. § 416.913(d)(4). In rejecting lay witness testimony, the ALJ need only provide "arguably

germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons." *Lewis*, 236 F.3d at 512.  An ALJ may reject lay witness testimony if it is inconsistent with the record.  *See, e.g., id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record);  *Bayliss*, 427 F.3d at 1218 (rejecting lay witness testimony conflicting with the medical record).  The ALJ may "draw inferences logically flowing from the evidence."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).  Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114.

**2.  Analysis**

Here, the ALJ failed to give any reasons, germane or otherwise, for rejecting Ms. Coberley's opinion.  This was error.  *See id.* ("under our rule that lay witness testimony 'cannot be disregarded without comment,' the ALJ erred in failing to explain her reasons for disregarding the lay witness testimony, either individually or in the aggregate.") (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)).  However, as in *Molina*, the error here is also harmless.  *See Molina*, 674 F.3d at 1115 (finding the error in failing to explain reasons for disregarding lay testimony harmless).  In that case, the Ninth Circuit stated that where lay testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with the Court's prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se.  *Molina*, 674 F.3d at 1117.

Here, the Court notes the lay witness provided testimony similar to that of Plaintiff, *i.e.*, both Plaintiff and Ms. Coberley stated that Plaintiff was less functional due to back pain, numbness, and migraine headaches than the ALJ found.  (*See, e.g., compare* AR 190 (Plaintiff states she does not cook meals other than frozen dinners because "it hurts to stand for long periods of time.") *with* AR180 (Ms. Coberley stated Plaintiff sometimes makes frozen dinners, but does not prepare meals because cannot sit or stand for very long); *compare* AR 190 (Plaintiff stated she cannot clean her bathroom) *with* AR 179, 180 (Ms. Coberley reported Plaintiff's cannot clean her

shower or toilet); *compare* AR 54, 188, 194 (Plaintiff stated she uses a cane as needed because her leg goes numb and periodically causes her to fall) *with* AR 184 (Ms. Coberley stated Plaintiff uses a cane and a walker and "tends to fall because her leg gives out."); *compare* AR 57 (Plaintiff testified that she can walk a only couple of blocks) *with* AR 183 (Ms. Coberley stated Plaintiff could walk "not more than a block or so"); *compare* AR 191 (Plaintiff shops for about 30 minutes) with AR 183 (Ms. Coberley stated Plaintiff can only shop for about a half hour); *compare* AR 47 (Plaintiff testified she performs no yard work) *with* AR 180 (Ms. Coberley stated she weeds and mows Plaintiff's lawn and Plaintiff needs help doing yard work).) As previously discussed, the ALJ properly rejected Plaintiff's testimony about the severity of her limitations on the grounds that the claims were inconsistent with her activities and her receipt of conservative treatment. (AR 32.) Like *Molina*, here, the lay testimony did not describe any limitations beyond those Plaintiff herself described, which the ALJ discussed at length and rejected based on well-supported, clear and convincing reasons. *Molina*, 674 F.3d at 1122. Accordingly, the error is harmless since it would not change the ultimate result. *See Stout*, 454 F.3d at 1055 (error harmless where it is non-prejudicial to claimant or irrelevant to the ALJ's ultimate disability conclusion).

## V. CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated: __**March 2, 2018**__          /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE